# EXHIBIT A

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**RAZVAN RUSOVICI,**

        **Plaintiff,**

**v.**                               **Case No. 6:22-cv-2172-ACC-EJK**

**THE UNIVERSITY OF CENTRAL
FLORIDA BOARD OF TRUSTEES,
MARCY VERDUIN and DOE
DEFENDANTS 1-20,[1]**

        **Defendants.**

---

## ORDER

This cause comes before the Court on Defendants University of Central Florida Board of Trustees and Marcy Verduin's Motion to Dismiss the Second Amended Complaint (Doc. 31) and Plaintiff's Response (Doc. 32). Because Plaintiff fails to respond to Verduin's qualified immunity arguments and fails to allege facts that sufficiently allege a violation of his right to substantive due process, Count I will be dismissed. As to Count II against UCF, because Plaintiff fails to allege an adverse action or comparators from outside the protected class, his discrimination claim will be dismissed as well. Accordingly, the Motion to Dismiss will be granted.

---

[1] As Defendants correctly point out, Plaintiff's Second Amended Complaint continues to erroneously refer to multiple "individual Defendant**s**" (plural) even though Veduin is the only named individual Defendant still in the case.

# I.   BACKGROUND

## A. Factual Background

Plaintiff Razvan Rusovici is a former student of the College of Medicine at the University of Central Florida ("UCF"), a public university. (Doc. 30 ¶¶ 2-3). Defendant Verduin was employed by UCF as an Associate Dean of Students. (*Id*. ¶ 4).

On January 27, 2020, Plaintiff took a 114-question musculoskeletal exam (the "Exam") on the computer using ExamSoft assessment software. (*Id.* ¶¶ 13-14). During the Exam, Plaintiff appeared jumpy and unfocused due to anxiety related to a relative's surgery; his eyes were also drawn to students who were making "a lot of noise." (*Id.* ¶ 21). Additionally, Plaintiff had been diagnosed with a glandular infection and had "dry eyes," which made him move his eyes around more often than other students during the Exam. (*Id.* ¶ 22).

On the day of the Exam, the ExamSoft system recorded Plaintiff's "clicks" and flagged them whenever his "click" (to select an answer) was within fifteen seconds[2] on the same question as the person in front of him. (*Id.* ¶ 24). ExamSoft recorded thirty-five such "clicks" by Plaintiff during the Exam. (*Id.* ¶¶ 25). Following the Exam, two UCF proctors (Phillip Bellew and Basma Selim) accused

---

[2] Plaintiff alleges that the fifteen-second limit was "arbitrary" and "no explanation to justify" the limit was given "by Defendant *Callahan*" (Doc. 30 ¶ 26), although there is no such named Defendant, proctor (*id.* ¶ 18), or member of the SPCC listed (*id.* ¶ 30).

Plaintiff of academic misconduct, and UCF compared the ExamSoft results to the results of five students within his grade range of the 120 other students in his class. (*Id*. ¶¶ 18, 27). On February 19, 2020, Associate Dean Jonathan Kibble informed Plaintiff of a "possible honor [code] violation" based on the conduct observed during the Exam. (*Id*. ¶ 29).

On February 21, 2020, an "initial hearing" was held by the Student Professional Conduct Council ("SPCC") consisting of Associate Dean Kibble and three other individuals (McClain, Foley and Orlando, but not Defendant Marcy Verduin). (*Id*. ¶ 30). During the SPCC's February 21 meeting, Plaintiff stated that "his eye contact is sometimes lacking" because of his "Romanian de[s]cent/Eastern European culture, where it is not usually polite to make direct eye contact." (*Id*. ¶ 31). The SPCC persisted in asking Plaintiff questions about his use of scrap paper to write down correct answers on paper, rather than using ExamSoft to enter the answers on the laptop. (*Id*. ¶¶ 33-35).

After the SPCC meeting with Plaintiff, on February 25, 2020, he was informed that a formal hearing was scheduled for March 6, 2020. (*Id*. ¶ 37). Plaintiff was provided the ExamSoft data regarding his Exam on March 2, 2020, four days before the scheduled formal hearing. (*Id*. ¶ 38). Plaintiff requested a one-week extension of

the March 6, 2020 hearing in order to review the data,[3] which UCF granted, and the hearing date was rescheduled for March 13, 2020. (*Id*. ¶ 40).

The day before the scheduled Honor Hearing, on March 12, 2020, Plaintiff contacted Associate Dean Verduin (a colleague of Associate Dean Kibble) to request an "informal resolution" as "outlined in Section 3.1.4.2 of the UCF College of Medicine MD Program Honor Code." (Doc. 30 ¶ 43). The pertinent portion of the UCF College of Medicine MD Program Honor Code (the "Honor Code") provided by Plaintiff (Doc. 32-1) states:

> **2. Guidelines of Professional Conduct**
> 2.1. Generally speaking, all students in the UCF College of Medicine M.D. Program shall abide by and uphold . . . honorable conduct . . . .
> * * *
> 2.5. Violations of this Honor Code shall include . . . .
> 2.5.2. Academic Misconduct –
> * * *
> **3. Procedures**
>
> The following procedures will be implemented when suspected dishonorable conduct is observed. . . .
> 3.1.2. Responsibility to Report -- Any person observing a suspected violation of the Honor Code is responsible for reporting the event to SPCC representatives within 5 business days of learning of the event.
> 3.1.3. Determination of Merit -- The SPCC Representative initially contacted shall meet with the SPCC Chair and the Associate Dean for Students to discuss the merits of the reported violation. Moreover, an informal investigation will be conducted by SPCC and Student Affairs to assess the merits of the reported violation. If

---

[3] Plaintiff alleges that he hired a "statistics company" to review the data. (Doc. 30 ¶ 39). Plaintiff contends that the analysis of the data showed that the "flagging system" was "unreliable," among other findings. (*Id*. ¶ 42).

sufficient merit is found, the SPCC representative initially contacted, the SPCC Chair, and the Associate Dean for Students will further assess whether an informal resolution is possible or an Honor Hearing is required.

3.1.4. Following the informal investigation by the SPCC and Student Affairs, notification of the charged student shall occur in writing as follows:

* * *

3.1.4.2. *Informal Resolution of Charge* -- In appropriate cases the SPCC Representative initially contacted*, the SPCC Chair, and the Associate Dean for Students may resolve the matter informally by agreement with the charged student.* This may include referring the student for counseling or assistance through the Professional Resource Network Impaired Practitioners Program of Florida. In such cases, the charged student will be notified in writing of their options.

3.1.4.3. Decision to Hold an Honor Hearing -- If a decision is made to hold a hearing, a confidential written record of the reported violation will be drafted that outlines the time, date, place, and nature of the suspected violation. The name of the charged student and the SPCC members making the decision for a hearing will also be on the document. This document will be copied and delivered to the charged student.

3.1.5. The proceedings in section 3.1 must take place within 5 business days after the initial report of a suspected Honor Code violation. The SPCC chair can waive the time requirement due to unforeseen circumstances.

3.2. Honor Code Hearing Preliminaries

3.2.1. The charged student shall have 5 business days after notification to appeal the decision to hold an Honor Code Hearing to the SPCC Chair.

3.2.2. In the case of a hearing, the Chair shall give written notice to the Associate Dean for Students and the Dean of the College that an investigation of a suspected Honor Code violation will begin, omitting from that notice the names and details of the accusation.

3.2.3. Notification to the charged student shall be via the written record produced in section 3.1.

3.2.4. An Honor Code Hearing shall begin within 5 business days of the notification of the charged student in order to ensure a swift hearing while still giving the charged student time to prepare.

3.2.5. The Chair shall be responsible for setting the hearing date, time, and location, and for informing all parties concerned of that information. Moreover, the Chair shall ensure that the Honor Code Hearing will not conflict with any upcoming academic examinations for the charged student or the SPCC representatives.

3.2.6. The time constraints of section 3.2 may be waived by the Chair in unusual circumstances or conditions beyond the control of the SPCC.

(Doc. 32-1 at 4-6 (emphasis added)).

Associate Dean Verduin denied Plaintiff's request for an "informal resolution" of the alleged Honor Code violation. (*Id.* ¶ 45). The same day, on March 12, 2020, and one day prior to the scheduled formal hearing, Plaintiff voluntarily withdrew from UCF. (*Id.* ¶ 49).

**B.** *Procedural History*

On November 21, 2022, Plaintiff filed suit against UCF "through its Board of Trustees," as well as Kibble, Verduin, and the two proctors present at the Exam. (Doc. 1). Following service on them in February 2023, Defendants filed a Motion to Dismiss Plaintiff's Complaint. (Doc. 14). Plaintiff filed an Amended Complaint on March 23, 2023, restyling the claims as against "the University of Central Florida Board of Trustees,"[4] and against Verduin, in her official and individual capacity, thereby dropping the other named individual Defendants. (Doc. 20). The Court

---

[4] *See* Fla. Stat. § 1001.72.

denied without prejudice Defendants' original Motion to Dismiss as mooted by Plaintiff's filing of the Amended Complaint. (Doc. 21).[5]

UCF and Verduin then filed their Motion to Dismiss the Amended Complaint (Doc. 22), Plaintiff responded (Doc. 26), and the Court entered an order dismissing all claims and granting leave to replead two claims. (Doc. 29). Because Plaintiff's due process claim against the state university was barred by Eleventh Amendment immunity, it was dismissed for lack of subject matter jurisdiction. (*Id.*). Plaintiff's unspecified "due process" claim against the only individual Defendant named in the Amended Complaint, Associate Dean Verduin, to the extent it alleged a procedural due process claim, was also dismissed. (*Id.*). Plaintiff was granted leave to amend only: (1) his claim of national origin discrimination under Title VI of the Civil Rights Act against UCF; and (2) a § 1983 claim for violation of his substantive due process rights against Verduin in her individual capacity. (*Id.*).

Plaintiff filed his Second Amended Complaint on June 28, 2023. (Doc. 30). On July 12, 2023, Defendants filed the instant Motion to dismiss the Second Amended Complaint (Doc. 31) and Plaintiff responded on August 2, 2023. (Doc. 32). The matter is ripe for review.

---

[5] To the extent Plaintiff included in the Amended Complaint a general claim against "Doe Defendants 1-20," those claims were effectively foreclosed when Plaintiff failed to timely name the specific individuals by June 2, 2023 (seven months after the case was filed) or assert any factual allegations against them by the deadline in the Case Management and Scheduling Order. (*See* Doc. 24; Doc. 30 ¶¶ 5, 65) (vaguely alleging that "Doe Defendants violated Plaintiff's constitutional rights in a manner to be determined during the course of the present litigation").

## II.   STANDARD OF REVIEW

Defendants argue that Plaintiff's two remaining claims in the Second Amended Complaint for national origin discrimination under Title VI of the Civil Rights Act against UCF (Count II) and his § 1983 claim for violation of "due process"[6] against Verduin in her individual capacity (Count I) should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

As the Court previously explained, in applying the standard for purposes of deciding a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true the factual allegations in the complaint and draws all reasonable inferences in the light most favorable to the plaintiff. *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). "Generally, under the Federal Rules of Civil Procedure, a complaint need only contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). However, the plaintiff's complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Thus, the Court is not required to accept as true a legal conclusion

---

[6] As the Court explained at length previously, Plaintiff failed to assert a viable procedural due process claim against Verduin. (*See* Doc. 29 at 17-22).

merely because it is labeled a "factual allegation" in the complaint; it must also meet the threshold inquiry of facial plausibility. *Id.*

## II.    ANALYSIS

### A. Count I-Violation of Substantive Due Process under § 1983 against Verduin in her individual capacity

Associate Dean Verduin argues that Plaintiff's § 1983 claim for violation of his substantive due process rights should be dismissed because he fails to allege any conduct by her that was not in an "official capacity." (Doc. 31 at 5). Verduin is correct that, to the extent Plaintiff attempts to allege Verduin's actions were done in her official capacity, such claims would be barred by Eleventh Amendment immunity. (*See* Doc. 29 at 8-13). Therefore, the Court limits the analysis of Plaintiff's allegations brought against Verduin to those alleged against her in her individual capacity for violation of his right to substantive due process. (Doc. 30 ¶¶ 58-68).

Verduin argues that Plaintiff's claim for violation of his substantive due process rights should be dismissed because she did not act arbitrarily in denying his request for an "informal resolution" the day before his formal Honor Hearing, and he does not have a protected property or liberty interest in his graduate education. Plaintiff concedes that certain aspects of the law on the issue are "unsettled," however, he argues that Verduin acted with an "improper motives." Verduin additionally argues that she is entitled to qualified immunity, and Plaintiff's response

to Verduin's qualified immunity argument is not addressed to *substantive* due process, therefore the Court addresses it first.

### 1. Qualified Immunity

Verduin argues that she is entitled to qualified immunity on Plaintiff's claim against her for violation of his right to substantive due process. "Qualified immunity provides complete protection for government officials sued in their individual capacities where their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Quinette v. Reed*, 805 F. App'x 696, 701 (11th Cir. 2020)[7] (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In determining whether an official is entitled to qualified immunity, the Court analyzes the following factors, as set forth by the Eleventh Circuit:

> In general, when government officials are performing discretionary duties, as all parties concede they were in this case, they are entitled to qualified immunity. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). A plaintiff may rebut this entitlement by showing that the government officials (1) committed a constitutional violation; and (2) that this violation was "clearly established" in law at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In theory, this judge-made doctrine is designed to protect government officials from the consequences of their reasonable mistakes made in the exercise of their official duties. *See id.* at 231. The test is conjunctive, and if a plaintiff fails either prong of the qualified immunity analysis, his claim is barred.

---

[7] Unpublished opinions of the Eleventh Circuit constitute persuasive, and not binding, authority. *See* 11th Cir. R. 36-2 and I.O.P. 6. The case summarizes well-settled case law.

> There are three recognized ways to show that a law is "clearly established." First, a plaintiff may show that a "materially similar case has already been decided," whose facts are similar enough to give the [officer] notice. *See Keating v. City of Miami*, 598 F.3d 753, 766 (11th Cir. 2010). Second, he may show that a "broader, clearly established principle should control the novel facts" of his case. *Id*. This "broader" principle may be derived from "general statements of the law contained within the Constitution, statute, or caselaw." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (alteration adopted) (emphasis added) (quoting *Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003)). Finally, a plaintiff may show that the officer's conduct "so obviously violates [the] constitution that prior case law is unnecessary." *Keating*, 598 F.3d at 766 (quoting *Mercado*, 407 F.3d at 1159). While we must be mindful of the "specific context of the case," we "do[] not require a case directly on point for a right to be clearly established." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (per curiam).

*Edger v McCabe*, 84 F.4th 1230, 1235 (11th Cir. 2023). Courts may address the two steps of the qualified immunity analysis in any order. *Pearson*, 555 U.S. at 236.

Associate Dean Verduin argues that she was acting within the scope of her discretionary authority in denying Plaintiff's request for an "informal hearing." Plaintiff does not dispute this; he alleges that Verduin is employed by UCF, and her "actions and omissions" were undertaken within the scope of her employment with UCF. (Doc. 30 ¶ 55). Because Verduin was acting within the scope of her discretionary authority as an associate dean when she denied Plaintiff's request, the burden shifts to Plaintiff to show that Verduin violated a "clearly established" constitutional right. *See Carter v. Butts Cnty., Ga*., 821 F.3d 1310, 1319 (11th Cir. 2016). Verduin argues that Plaintiff cannot point to any decision "clearly

establishing" such a right before the events at issue in the Second Amended Complaint, and she is entitled to qualified immunity from Plaintiff's substantive due process claim. Plaintiff does not respond to Verduin's well-supported argument that she is entitled to qualified immunity on his substantive due process claim, therefore, the Motion to Dismiss Count I can be granted on that basis alone.

Plaintiff asserts, without any citation to authority whatsoever, that his "due process rights" were "clearly established at the time of the taking." (Doc. 32 at 11).[8] Instead of addressing *substantive* due process, Plaintiff repeatedly refers to *procedural* due process rights: "At the bare minimum, due process requires oral or written notice of the charges against the student and, if the student denies them, an explanation of the evidence the authorities have." (*Id*. at 12 (citing *Goss v. Lopez*, 419 U.S. 565, 579 (1975)). Plaintiff argues that he should have been given more time to analyze the "spurious" ExamSoft data before the scheduled formal hearing (although he was given the one-week extension he requested). (*Id*. at 12-13).

To the extent that Plaintiff alleges that Verduin committed a *substantive* due process violation, the allegation is devoid of any factual support. In the Second Amended Complaint, Plaintiff alleges no facts to support his allegation that by denying his request for an "informal resolution" and denying Plaintiff the

---

[8] Plaintiff alleges: "Defendants acted intentionally to deprive Plaintiff of those rights in the handling of Plaintiff's discipline hearing" and "assumed guilt against a preponderance of the evidence and wrongfully found Plaintiff guilty of a disciplinary violation with irreparable harm as a result." (Doc. 32 at 11-12).

opportunity to appeal this decision," Verduin "violated [his] substantive due process right to be free from arbitrary state action." (Doc. 30 ¶ 64 (citing Section 3.1.4.2 of the Honor Code); Doc. 32 at 6).[9] Count I vaguely alleges that Associate Dean Verduin's "decision to charge Plaintiff with a detrimental integrity violation" was "based on improper motive, *i.e.*, personal vendetta, bias and/or prejudice, not on academic grounds" and was "in bad faith." (Doc. 30 ¶¶ 45-48).

Plaintiff's Second Amended Complaint completely fails to set forth any factual basis whatsoever in support of his allegation that Verduin had a "personal vendetta, bias, prejudice," or acted in "bad faith." In *Goodman v. President & Trustees of Bowdoin College*, the district court denied the college's motion to dismiss the Title VI discrimination claim of an American student expelled for a fistfight with a Korean student who was a "fully exonerated" even though he admitted to starting the fight. 135 F. Supp. 2d 40, 48 (D. Me. 2001). The expelled student alleged that the academic dean in charge of the student judicial board showed bias in removing one student connected to an eyewitness giving favorable testimony and declining to remove the chairperson who had previously expressed in writing to the expelled student that "she did not trust his word" and would use "this distrust against him," as well as dean's decision to appoint a "vigorous prosecutor" to the

---

[9] To the extent that Plaintiff alleges Verduin violated his due process rights "by forcing him to withdraw without providing a *fair procedure*," such an allegation would go to a procedural due process claim, which the Court previously dismissed. (*See* Doc. 29 at 17-23).

expelled student's case and a "passive" prosecutor to the exonerated student's case. *Id*.

Moreover, the actions Plaintiff alleges—charging Plaintiff with an integrity violation—were not taken by Verduin at all and were instead taken by the proctors at the exam, or the SPCC Committee, of which Verduin was not a member, or were taken by Associate Dean Kibble. Plaintiff alleges in the Second Amended Complaint that Associate Dean Kibble, and not Associate Dean Verduin, was involved with the SPCC and the Honor Code procedures to address the allegations of Plaintiff's misconduct.

Under the Honor Code, after the informal investigation of Plaintiff's suspected misconduct, one option for the SPCC Chair and Associate Dean Kibble would have been to attempt to reach an "informal resolution" of the charge with Plaintiff. (*See* Doc. 32-1 (Honor Code § 3.1.4.2)). However, as Verduin argues in pointing to the applicable provisions of the Honor Code, there is no provision which allows for an "informal resolution" once the SPCC members have decided, following the SPCC's informal investigation, to hold an Honor Hearing pursuant to § 3.1.4.3. In Plaintiff's case, he took the exam on January 27, 2020, the proctors accused him of academic misconduct following the exam, and Associate Dean Kibble informed Plaintiff of the suspected "breach of conduct" and violation of the Honor Code violation on February 19, 2020. (Doc. 30 ¶¶ 13, 18, 29). The following day, Plaintiff attended what he refers to as the SPCC's "initial hearing." (*Id*. ¶ 30).

However, Section 3.1.3 of the Honor Code describes an "informal investigation" and "informal resolution":

> 3.1.3 Determination of Merit . . . [A]n informal investigation will be conducted by SPCC and Student Affairs to assess the merits of the reported violation. If sufficient merit is found, the SPCC representative initially contacted, the SPCC Chair, and the Associate Dean for Students *will further assess whether an informal resolution is possible or an Honor Hearing is required*.

(Doc. 32-1 at 5 (emphasis added)). Under the next section, §3.1.4, "[f]ollowing the informal investigation by the SPCC and Student Affairs, notification of the charged student shall occur in writing" with three possible alternatives:

> (1) a finding that the accusation was "meritless"; or
> (2) "informal resolution" of the charge; or
> (3) the "decision to hold an Honor Hearing."

(*Id*. at 5-6). On February 25, 2020, Plaintiff was informed of the SPCC's decision to hold the Honor Code Hearing on March 6, 2020. (Doc. 30 ¶ 37). At that point, the SPCC had chosen to pursue option 3 and decided to hold an Honor Hearing *instead of* pursuing an "informal resolution" of the charge (option 2). The Honor Code does not provide any administrator—especially not an alternative associate dean such as Verduin in this case—with the authority to schedule an "informal resolution" *after* the SPCC has already made the decision to convene an Honor Hearing.

Plaintiff was not denied an appeal by Verduin or any administrator. As Verduin points out, once Plaintiff learned on February 25, 2020 of the SPCC's

decision to hold the Honor Hearing, he had the right to appeal that decision to the SPCC Chair by March 3, 2020:

> 3.2.1. The charged student shall have 5 business days after notification to appeal the decision to hold an Honor Code Hearing to the SPCC Chair.

(Doc. 32-1 at 6). In this case, Plaintiff opted not to appeal to the SPCC chair under Honor Code § 3.2.1 and, instead, opted to ask Associate Dean Verduin for an "informal resolution" (Doc. 30 ¶ 45) even though the SPCC had already decided to hold the formal hearing. Plaintiff has failed to establish that denial of a request for an "informal hearing" by an associate university dean—especially one completely unconnected to the SPCC's on-going academic misconduct process—was a violation of substantive due process that was "clearly established" at the time of the alleged misconduct.

As the Eleventh Circuit has explained, the standard for § 1983 challenges to decisions by higher-education universities in academic dismissal cases is whether the administrators "abdicated their responsibility to exercise professional judgment":

> [The plaintiff] Page also claims that the individual defendants violated her substantive-due-process rights by dismissing her "intentionally, willfully, negligently, maliciously, with deliberate indifference, and/or with a reckless disregard for the natural and probable consequences of their act." This claim also fails. In *Regents of University of Michigan v. Ewing*, the Supreme Court assumed without deciding that a medical student had a constitutionally-protected, substantive-due-process right in his continued enrollment in medical school. 474 U.S. 214, 222–23, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). In evaluating the medical student's claim, the Court cautioned that "[w]hen judges are asked to

review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment." *Id*. at 225, 106 S.Ct. 507. Judges "[p]lainly" should not "override" faculty decisions concerning academic dismissals, the Court continued, unless a decision represents "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id*. This is because an academic-dismissal decision requires "an expert evaluation of cumulative information" that is "not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id*. at 226, 106 S.Ct. 507 (quoting *Horowitz*, 435 U.S. at 90, 98 S.Ct. 948).

Here, nothing in Page's complaint indicates that the individual defendants "substantial[ly] depart[ed]" from academic norms in a manner that would require judicial "override." *Ewing*, 474 U.S. at 225, 106 S.Ct. 507. Clinical supervisors evaluated Page's nursing and found it to be "unsafe," the negative clinical evaluations resulted in a failing grade, Page was dismissed for failing her clinicals, and her appeal was thoroughly considered. In the absence of any allegations tending to show that UAB faculty members abdicated their responsibility to exercise professional judgment, Page fails to state a substantive-due-process claim against McMullan, Hicks, or Tofani in either their individual or official capacities.

*Page v. Hicks*, 773 F. App'x 514, 519-20 (11th Cir. 2019). *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985) (holding, in assessing substantive due process claim by medical school student that university acted "arbitrarily" in expelling him, that the court may not override the faculty's decision "unless it is such a substantial departure from accepted academic norms" to demonstrate that the committee "did not actually exercise professional judgment"); *Rollins v. Bd. of Trustees of the Univ. of Ala*., 647 F. App'x 924 (11th Cir. 2016) ("[b]y and large, public education in our Nation is committed to the control of state and local authorities" and "courts are reticent to intrude on that historic control") (citations

omitted); *Keeton v. Anderson-Wiley*, 664 F.3d 865, 883 (11th Cir. 2011) (Pryor, C.J. concurring) ("Cognizant that judges lack the on-the ground expertise and experience of school administrators . . . . [the Supreme Court has] cautioned courts in various contexts to resist 'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review. . . . In matters of instruction and academic programs, federal judges must instead exercise restraint.") (citations omitted).

As Verduin points out, Plaintiff has not alleged facts that Verduin "substantially departed from academic norms," *see Ewing,* 474 U.S. at 229. To the contrary, Verduin's denial of Plaintiff's request for an "informal resolution" was consistent with the Medical School's Honor Code, which clearly demonstrates that she did not have the authority to override the decision of the SPCC and Associate Dean Kibble once they had decided to move forward with the formal Honor Hearing. Plaintiff's recourse under the Honor Code was an appeal to the SPCC Chair, and there is no indication in the Second Amended Complaint that Plaintiff chose to pursue such an appeal; instead, as he alleges, he withdrew from UCF. Accordingly, Plaintiff's § 1983 claim against Associate Dean Verduin (Count I) will be dismissed on the basis of qualified immunity.

### 2. *Substantive Due Process Claim*

Verduin alternatively argues that Plaintiff's substantive due process claim should be dismissed because he does not have a protected property or liberty interest

in his graduate education. Verduin also argues that did not act "arbitrarily" in denying his request for an "informal resolution" the day before his formal Honor Hearing. To state a § 1983 claim for violation of substantive due process rights in the academic setting, Plaintiff must prove: "(1) the existence of a protected property or liberty interest; and (2) arbitrary and capricious conduct on the part of state officials by showing that there was no rational basis for their decision or that the decision was motivated by bad faith or ill-will unrelated to academic performance." *Schuler v. Univ. of Minn.*, 788 F.2d 510, 515 (8th Cir. 1986); *see also Ewing*, 474 U.S. at 223; *Hamke v. Univ. of Cent. Fla.*, No. 6:10-CV-1828-ORL-35KRS, 2011 WL 13298734, at *4 (M.D. Fla. July 15, 2011).

### a.  Property or Liberty Interest

Verduin argues that neither the Supreme Court nor the Eleventh Circuit has established that continued enrollment in a post-secondary educational institution is an interest protected by the 14th Amendment's right of substantive due process. She argues that the United States Supreme Court, the Eleventh Circuit and the Florida Supreme Court have never concluded that a protected property interest exists in a student's post-secondary education at a public college and courts within the Eleventh Circuit have affirmatively held that no such right exists.

Plaintiff argues that he has a constitutionally -protected property right in his degree and a liberty interest in his academic reputation, but he admits that the law in this area regarding expelled university students is "unsettled"—even though he

devotes most of his argument on this claim to the issue. He acknowledges that neither "the Supreme Court nor the Eleventh Circuit have explicitly recognized a property interest in a student's continued enrollment in a public college or university," but these courts have "assumed" that such an interest exists. (Doc. 32 at 3). Plaintiff misinterprets the cases he cites as converting the "assumed interest" for analysis purposes to recognition of a right, when, as in *Regents of University of Michigan v. Ewing*, the Supreme Court "assumed without deciding" that a medical student had a constitutionally-protected, substantive-due-process right in his continued enrollment in medical school. 474 U.S. 214, 222–23 (1985).

Following that precedent, courts in the Eleventh Circuit have at times assumed *arguendo* that a constitutional right exists. *See Hamke*, 2011 WL 13298734, at *4 (noting that neither the Supreme Court nor the Eleventh Circuit Court of Appeals "has decided whether a protected property interest exists in a student's post-secondary education") (citations omitted). Although the Eleventh Circuit has held that "students at a public university do not have a fundamental right to continued enrollment," *Doe v. Valencia Coll.*, 903 F.3d 1220, 1235 (11th Cir. 2018),[10] it has in other cases assumed *arguendo* that Plaintiff had a constitutionally-protected property interest for purposes of a full analysis. *See Page v. Hicks*, 773 F. App'x 514,

---

[10] Plaintiff cites contract cases filed against private universities seeking Covid-19 related refunds – which would not apply in the context of a constitutional claim against a public university. (Doc. 32 at 4 (citing *Rosado v. Barry University Inc.*, 499 F. Supp. 3d 1152 (S.D. Fla. Oct. 30, 2020); *In re Univ. of Miami Covid-19 Tuition & Fee Refund Litig.*, 524 F. Supp. 3d 1346, 1352 (S.D. Fla. 2021)).

518-19 (11th Cir. 2019) (assuming without deciding that dismissed graduate student had a constitutionally-protected property interest in her enrollment but noting that "[t]he Supreme Court has not addressed whether a graduate student has a constitutionally-protected liberty or property interest in her continued enrollment at a public university, although the Court presumed without deciding the existence of such a right").

### b. Arbitrary Conduct

Associate Dean Verduin argues that, even if Plaintiff could meet the first element of a substantive due process claim, his Second Amended Complaint fails to allege any facts supporting a claim that Verduin acted in an arbitrary and capricious manner, that she lacked a rational basis for her actions, or that she was motivated by malice or ill-will. (Doc. 31 at 8).

Plaintiff responds in a circular fashion that he is alleging a violation of his "due process rights" to be free from arbitrary state action based on Verduin's intentional "decision to charge Plaintiff with a detrimental integrity violation and deny Plaintiff a medical degree from UCF . . . based on improper motive, *i.e.*, personal vendetta, bias and/or prejudice, not on academic grounds." (Doc. 32 at 2). He argues that Verduin failed to "exercise professional judgment in denying Plaintiff the required substantive due process and ultimately his degree." (*Id.*). While Plaintiff acknowledges that "[c]onduct by a state actor will rise to the level of a substantive due process violation only when 'the [conduct] can be characterized as arbitrary or

conscience shocking in a constitutional sense,'" he fails to recognize that Verduin was not involved in any of the steps taken against him regarding the Honor Code violation.

As explained at length above, Plaintiff has not alleged any facts that Verduin personally played any role in the "decision to charge plaintiff with a detrimental integrity violation" or in the ongoing Honor Code proceedings; the vast majority of Plaintiff's factual allegations do not refer to any actions taken by Verduin at all. Instead, Plaintiff alleges that the two proctors accused Plaintiff of cheating, and, after an informal hearing with the SPCC, including Associate Dean Kibble—*not* Associate Dean Verduin—the SPCC decided to move forward with a formal hearing. Plaintiff alleges that the statements he made regarding his "Eastern European culture" were made to the SPCC, and not to Verduin.

Verduin argues that under the Supreme Court's explanation of the "arbitrary and capricious" standard and the requisite deference for academic decisions, "[w]hen judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment" which they "may not override" unless it "is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." (Doc. 31 at 8 (quoting *Ewing*, 474 U.S. 214 at 223)). As explained in the Eleventh Circuit's (unpublished) *Page v. Hicks* decision cited above, "[w]hen judges are asked to review the substance of a genuinely

academic decision, such as this one, they should show great respect for the faculty's professional judgment." *Page*, 773 F. App'x at 520 (citing *Ewing*, 474 U.S. at 225); *Rollins v. Bd. of Trustees of the Univ. of Alabama*, 647 F. App'x 924, 930-31 (11th Cir. 2016) (quoting *Ewing*: judges "asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment"). Courts "may not override" the faculty decision "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing,* 474 U.S. at 225.

Plaintiff argues that "Defendants acted intentionally to deprive Plaintiff of those [constitutional] rights in the handling of Plaintiff's discipline hearing. As a result of Plaintiff's national origin, Defendants assumed guilt against a preponderance of the evidence and wrongfully found Plaintiff guilty of a disciplinary violation with irreparable harm as a result." (Doc. 32 at 11-12 (quoting *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003)). However, the only factual allegations Plaintiff makes in his claim against Associate Dean Verduin is that, after the investigation into Plaintiff's possible academic misconduct conducted by Associate Dean Kibble and the SPCC, Plaintiff separately asked Associate Dean Verduin for an "informal hearing" or "informal resolution" (in Honor Code terms) one day before his scheduled formal hearing, and she denied this request. (Doc. 30 ¶¶ 43, 45, 64). Verduin argues that Plaintiff has not sufficiently

alleged her decision to deny his request for an "informal hearing" was a "substantial departure from academic norms," the standard set forth by *Ewing*.

In this case, Plaintiff's Second Amended Complaint does not explain why he contacted Associate Dean Verduin, particularly when it was Associate Dean Kibble who was involved in the investigation and notified Plaintiff of the alleged honor code violation. Verduin's denial of Plaintiff's request for an "informal resolution"— what would have been in effect a *second* informal hearing or a parallel track to the informal hearing the SPCC had already held—does not qualify as "shocking the conscience." Moreover, there is no allegation that Associate Dean Verduin had the authority to grant any such relief when her colleague, Associate Dean Kibble, was the administrator handling Plaintiff's case. *See Cobb v. The Rector & Visitors of Univ. of Virginia*, 69 F. Supp. 2d 815, 834 (W.D. Va. 1999) (dismissing claims against university officials who lacked authority to overturn decision of student honor committee finding student had cheated on examination).

Although Plaintiff continues to refer to a "Violation of Due Process" in the Second Amended Complaint (Doc. 30 at 9) without any precision, and argue that he was given only four days (notwithstanding receiving the one-week extension he requested)[11] to analyze the ExamSoft data, the thrust of the allegation continues to be to a challenge to the *procedural* due process he received. In his Response brief,

---

[11] Plaintiff continues to make this argument despite acknowledging he was granted the one-week extension that he requested. (Doc. 30 ¶ 40).

he relies almost exclusively on *procedural* due process cases and arguments[12] even though his procedural due process claim was previously dismissed with prejudice. (*See* Doc. 29 at 17-22).[13]

Even if the Court had not determined that dismissal of the § 1983 claim against Verduin was warranted on the basis of qualified immunity, as explained *supra*, Plaintiff's substantive due process claim against Verduin would be dismissed based on the lack of factual allegations to support his claim that Verduin violated his right to substantive due process by denying his request for an "informal hearing" or "informal resolution" one day before his formal Honor Hearing.

## B.  Count II – Title VI Discrimination against UCF

Plaintiff alleges in Count II a claim against UCF for violation of Title VI of the Civil Rights Act of 1964, which "prohibits any recipient of federal financial assistance from discriminating on the basis of race, color, or national origin in any federally funded program." *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1202 (11th Cir. 1999); 42 U.S.C. § 2000d. The statute allows a private plaintiff to obtain injunctive relief and damages when intentionally discriminated against by a federal-

---

[12] (*See* Doc. 32 at 6-7, 11-12 (citing *Goss v. Lopez*, 419 U.S. 565, 579, 581 (1975) (procedural due process case regarding notice and a hearing) and *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003) (discussing "constitutionally inadequate process")).

[13] To the extent Plaintiff states that "[t]he Eleventh Amendment does not insulate state officials from suit for prospective declaratory and injunctive relief to remedy violations of federal constitutional law" (Doc. 32 at 7), the Court fully addressed this argument in the June 14, 2023 Order explaining in detail why Plaintiff's claims against UCF Trustees would be barred by Eleventh Amendment immunity. (*See* Doc. 29 at 8-13). Plaintiff has not alleged that Associate Dean Verduin has the authority to "expunge all records" and "readmit" him. (Doc. 30).

funds recipient on account of race, color, or national origin. *Alexander v. Sandoval*, 532 U.S. 275, 279–80 (2001).

UCF moves for dismissal of Count II, arguing that the facts as alleged in Plaintiff's Second Amended Complaint do not give rise to a reasonable inference that his national origin was a substantial or motivating factor for UCF's actions. (Doc. 31 at 16). The Second Amended Complaint alleges that the SPCC violated "Plaintiff's rights under Title VI of the Civil Rights Act of 1964 when, having awareness of Plaintiff's national origin [Romanian] and its customs of eye contact, Defendants intentionally discriminated against Plaintiff in not taking into account the cultural differences throughout the entire discipline process resulting in Plaintiff being harmed through the discipline process." (Doc. 30 ¶¶ 73-74). "Plaintiff informed the hearing board [SPCC] that he was from an Eastern European culture (Romania) where it is impolite to make direct eye contact. Plaintiff asked the hearing board to keep this in mind throughout his hearing and not judge the honesty [of] his answers based on eye contact alone." (*Id*. ¶¶ 75-76). Plaintiff alleges that UCF intentionally discriminated against him, treating him differently from other students, when it "actively failed to take into consideration Plaintiff's national origin/cultural differences in eye contact" and "[a]s a result of Plaintiff's national origin and Eastern European culture, Plaintiff was viewed as untrustworthy and found guilty of a policy violation against the weight of the evidence." (*Id*. ¶¶ 77-79).

To establish a prima facie case of national origin discrimination in an educational setting under Title VI, a plaintiff must allege either "direct evidence of discriminatory conduct,"[14] or, absent such evidence, that "(1) he is a member of a protected class; (2) he suffered an adverse action in pursuit of his education by defendant; (3) he was treated differently from similarly situated students who are not members of the protected class; and (4) he was qualified to continue in his educational pursuit." *See Salem v. New York Univ.*, No. 22-CIV-5112, 2023 WL 3509832, at *4 (S.D.N.Y. Apr. 28, 2023) (cleaned up; citations omitted), *report and recommendation adopted*, No. 22-CV-5112 (VEC), 2023 WL 3506402 (S.D.N.Y. May 17, 2023) (applying *McDonnell Douglas* burden shifting for indirect claims under Title VI);[15] *see also Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 921 (7th Cir. 2007) (the plaintiff can prove intentional discrimination by establishing that he (1) is a member of a protected class, (2) was meeting the university's legitimate expectations, (3) there was an adverse action, and (4) was treated worse than similarly situated students). Plaintiff baldly asserts that "Plaintiff's cultural differences amounted to a substantial and motivating factor in the board's decision."

---

[14] Plaintiff does not allege any "direct evidence of discriminatory conduct," such as direct comments relating to his national origin. "Direct evidence is evidence that establishes the existence of discriminatory intent behind the [applicable] decision without any inference or presumption." *Lovett v. Georgia-Pac. Consumer Prod., LP*, 418 F. Supp. 3d 1311, 1319 (S.D. Ga. 2019) (citing *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000)).

[15] "Courts regularly use Title VII caselaw to analyze Title VI claims." *See Glover v. Dist. of Trustees of Palm Beach State Coll.*, No. 9:19-CV-80968, 2020 WL 3118469, at *2 (S.D. Fla. Jan. 23, 2020) (collecting cases).

(Doc. 32 at 14). However, "[s]ubjective belief alone cannot prove intentional discrimination." *Mandawala v. Ne. Baptist Hosp*., 16 F.4th 1144, 1151 (5th Cir. 2021) (finding plaintiff's subjective belief and feeling that program's instructor treated non-white students differently was conclusory and, without more, did not allow for a reasonable inference of intentional discrimination).

UCF argues that the Second Amended Complaint fails to make any connection between UCF's disciplinary process and Plaintiff's lack of eye contact with others, specifically because the proctors who reported him for possible academic misconduct (Bellew and Selim) did not know of his Romanian descent at the time they reported him, and there is no allegation that anyone from UCF noticed or mentioned his lack of eye contact, his Romanian descent, or any aspect of his "Eastern European culture" during the informal investigation. (Doc. 31 at 16). UCF further argues that Plaintiff fails to identify any student who was allegedly treated differently in similar academic circumstances, and instead relies on conclusory opinions without a factual basis to support a claim of Title VI discrimination.[16]

UCF also argues that it did not actually take any "adverse action" against Plaintiff for which he may seek relief because scheduling an Honor Code hearing, without actually holding one, does not constitute an "adverse action." Since Plaintiff

---

[16] UCF argues that Plaintiff's Second Amended Complaint adds the claim that he is of Romanian descent but otherwise merely substitutes his former conclusions that UCF's conduct disparately impacted Plaintiff (which was previously dismissed) with new conclusory allegations that UCF's conduct was "intentional," without providing any factual support for the new allegations. (Doc. 31 at 17).

chose to voluntarily withdraw from UCF before the formal hearing, UCF argues, the consequences he suffered were a result of his voluntary decision to withdraw and were not based on actions taken by UCF. UCF contends that Plaintiff had an opportunity to prevail at the Honor Hearing scheduled for March 13, 2020, and if he had lost at that stage, he could have filed a petition for certiorari review with the state circuit Court. [17] UCF contends that, based on Plaintiff's failure to take advantage of the Honor Code's full procedures and potential remedies available to him, his Title VI claim should be dismissed with prejudice.

To state a claim for Title VI discrimination, a plaintiff must allege that he suffered an "adverse action." *See Brewer*, 479 F.3d at 921; *Bowers v. Bd. of Regents of Univ. Sys. of Georgia*, 509 F. App'x 906, 912 (11th Cir. 2013) (affirming dismissal of medical school applicant's Title VI claim against board where allegations that he was denied permission to speak at board meetings, copy board documents, was asked to leave, and was followed by a security guard were not "materially adverse" actions that could support a Title VI retaliation claim).

In this case, Plaintiff alleges that the SPCC violated Title VI when it "intentionally failed to consider the cultural differences" and "found [him] guilty of an integrity violation" despite his explaining that his Romanian national origin and

---

[17] *See* Fla. R. App. P. 9.100(c) and 9.190(b)(3) (providing for certiorari review of quasi-judicial actions of state agencies, boards and commissions).

customs reduced his eye contact with the SPCC during the informal hearing.[18] As an initial matter, based on Plaintiff's allegations in the Second Amended Complaint, he was never actually "found guilty of an integrity violation." Rather, the SPCC decided to schedule a "formal" Honor Hearing which Plaintiff did not attend because he withdrew from UCF the day before. Voluntarily withdrawing from a school or college has been held not to constitute an "adverse action." *A.A. v. Warsaw Cmty. Sch. Corp.*, No. 3:21-CV-378-JD, _ F. Supp. 3d _, 2023 WL 3863441, at *5 (N.D. Ind. June 7, 2023) (holding that student's voluntary withdrawal from school one day after being disciplined for cutting in line for the bus did not constitute an "adverse action"); *Smith v. Lutheran Univ. Ass'n Inc.*, *Valparaiso Univ.*, No. 2:21-CV-178-TLS-JPK, 2021 WL 4902492, at *3 (N.D. Ind. Oct. 21, 2021) (dismissing Title VI claims where student failed to identify any specific "adverse action" taken against him by chemistry or social work professors). Here, UCF did not take a materially adverse action—the SPCC having failed to reach a final conclusion in Plaintiff's case during the scheduled Honor Hearing—and Plaintiff's Title VI claim could be dismissed on that basis alone.

UCF additionally argues that Plaintiffs' Title VI claim fails because he has not identified a similarly situated student from outside the protected class (*i.e.*, not

---

[18] Plaintiff does not allege that the proctors who initiated the misconduct complaint were aware of Plaintiff's Romanian descent or that they relied on anything other than their personal observations and/or the ExamSoft results.

Romanian) who was treated differently. *See, e.g., Beaulieu v. Ashford Univ.*, 529 F. Supp. 3d 834, 850 (N.D. Ill. 2021) (a prima facie showing under the indirect method requires a plaintiff to identify a similarly-situated person from outside the protected class who is treated differently than the plaintiff from the protected class); *A.A.,* 2023 WL 3863441 at *6 ("The purpose of the similarly situated requirement is "to eliminate all other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus."). "In the educational context, a similarly situated student must exhibit similar conduct." *Id*. (citation omitted).

In his Response, Plaintiff argues in conclusory fashion that "Plaintiff was treated differently than other students of alternate ethnic backgrounds," (Doc. 32 at 13), but he fails to identify any specific students. He argues that even though he informed the SPCC that "he was from an Eastern European culture where it is impolite to make direct eye contact," the SPCC "failed to account for the cultural differences throughout the entire discipline process" and, thus, "viewed him as untrustworthy." (*Id*.). Such deficient allegations are insufficient to withstand a motion to dismiss a Title VI claim. *See, e.g., Khan v. Midwestern Univ.,* 147 F. Supp. 3d 718, 721 (N.D. Ill. 2015) (Title VI claim dismissed where plaintiff alleged that university discriminated in not accommodating her because she was an "American woman of Indian descent," but failed to allege any students of another race or national origin were treated differently or any direct evidence); *Miller v. Fla. Hosp.*

*Waterman*, No. 5:13-cv-249-WTH-PRL, 2013 WL 5566063, at *2 (M.D. Fla. Oct. 8, 2013) (dismissing a Title VI discrimination claim where the plaintiff failed to identify "how she was treated differently than any white comparators"); *cf. Goodman v. President & Trustees of Bowdoin Coll.*, 135 F. Supp. 2d 48 (D. Me. 2001) (denying college's motion to dismiss Title VI claim of American student expelled for fighting who sufficiently alleged that "exonerated" Korean student who admitted to starting the fight was treated more favorably by the administrator in charge of the disciplinary proceeding).

In *Farrukh v. University of South Florida Board of Trustees*, a Pakistani student sued the university under Title VI for race discrimination after an instructor accused him of cheating on an exam, dismissed him from the course, and gave him a final grade of "F" on his transcript. No. 8:20-CV-73-VMC-TGW, 2021 WL 2156222, at *4 (M.D. Fla. May 27, 2021), *aff'd*, No. 21-13345, 2022 WL 3973703 (11th Cir. Sept. 1, 2022). Judge Covington of the Middle District granted the university's motion to dismiss the student's discrimination claim where he failed to explain how the instructor or the Board of Trustees had treated other students of a different race more favorably in comparable circumstances. *Id.* The Eleventh Circuit affirmed the dismissal of the disciplined student's Title VI claim based on his conclusory allegations that USF employees treated him less favorably than non-Pakistani students because he had failed to identify any student who was treated more favorably under comparable circumstances that would support a plausible

inference that the plaintiff's mistreatment was motivated by Plaintiff's race or national origin. *Farrukh v. Univ. of S. Fla. Bd. of Trustees*, No. 21-13345, 2022 WL 3973703, at *3 (11th Cir. Sept. 1, 2022). In this case, Plaintiff has failed to identify any students who were treated more favorably in an academic discipline process.

### C. Futility of Amendment

Defendants seek a dismissal of Plaintiff's claims with prejudice. A district court may dismiss a complaint with prejudice when granting leave to amend would be futile. *W. Sur. Co. v. Steuerwald*, 760 F. App'x 810, 814 (11th Cir. 2019). If a more carefully drafted complaint could state a viable claim, a district court should give the plaintiff at least one chance to amend before dismissing with prejudice. *Id.* But a district court need not give the plaintiff another chance when the court has already given instructions concerning a deficiency in the complaint and the plaintiff squanders it. *See Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 930 (11th Cir. 2016) ("[The Eleventh Circuit] ha[s] never required district courts to grant counseled plaintiffs more than one opportunity to amend a deficient complaint, nor ha[s] [the Eleventh Circuit] concluded that dismissal with prejudice is inappropriate where a counseled plaintiff has failed to cure a deficient pleading after having been offered ample opportunity to do so.").

Plaintiff, through counsel, has now filed the third iteration of his claims. The Court previously discussed at length the deficiencies in his operative pleading before allowing him leave to file the Second Amended Complaint. (*See* Doc. 29). He has

been accorded ample opportunity to cure the deficiencies identified by the Court, but he has failed to do so. No further opportunities are warranted, and the Second Amended Complaint will be dismissed with prejudice.

<strong>CONCLUSION</strong>

Based on the foregoing, it is ordered as follows:

1. Defendants University of Central Florida Board Of Trustees and Marcy Verduin's Motion to Dismiss the Second Amended Complaint (Doc. 31) is **GRANTED**.

2. Plaintiff's Second Amended Complaint (Doc. 30) is **DISMISSED with prejudice**.

3. The Clerk is **DIRECTED** to close the file.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on December 9, 2023.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record